349 P.2d 321

STATE of Utah, by and through its ROAD COMMISSION, Plaintiff and Appellant,

v.

J. Howard VALENTINE and Florence S. Valentine, Defendants,

Western States Refining Company, a Corporation, Intervening Defendant and Respondent.

No. 9100.

Supreme Court of Utah.

Feb. 18, 1960.

133

Walter L. Budge, Atty. Gen., Wallace B. Kelly, Asst. Atty. Gen., for appellant.

Cotro-Manes & Cotro-Manes, Salt Lake City, for respondent.

HENRIOD, Justice.

Appeal from a judgment in favor of intervenor Western States Refining, lessee claimant, in a condemnation proceeding levelled against Valentine and his wife, defendant fee owners. Reversed.

■ Valentine acquired the subject property in 1947, at which time and thereafter he was informed that a highway was going through the area. He said such information caused him to delay improving the property.

The State sued on July 31, 1952, by service of process. Hearing on a motion for immediate occupancy was had August 12, 1952. It was shown that State agents had noticed building activity on the property and precipitated this action to prevent enhancement of value, so the State would not have to buy a going business. A second

hand, frame, unfinished building had been moved onto the property, leveling had been done, gas pump islands constructed, but no gas pumps had been installed, no permanent surfacing accomplished, the building was unpainted and unfinished inside and out, and no business was being conducted. Thereafter, subject to a conditional order of the court, the building was finished and a service station operated.

At hearing on motion for immediate occupancy, Valentine not only was the fee owner, but was Vice-President of intervenor, Western Refining. He was represented by a local attorney and by the President of Western Refining, who also was an attorney.

The trial court took the position and rightly so, that the value of the property was determinable as of the date the action was commenced and he cautioned that "the more installation he (Valentine) puts in without an agreement, the more there will be to pull out". Valentine responded that *"We* can get back the big share of this money the next few months on the gallonage, we sell." The court rejoined that an order could be entered so that *Valentine* might continue to occupy the premises until the State was ready to take over *"but the value will be as of today"* and "if you go from the time of summons, it doesn't make any difference how big a business they build on there." Valentine's attorney agreed and said *"We* would just like the use

of it while the State doesn't need the use of it." The court: "Well, you will stipulate then that you will raise no question as to the value of it?" Counsel said "To any enhancement from the service of summons. *We* will stipulate to that your Honor." The Court enjoined that *"Under the order of occupancy, Mr. Valentine, you are not to do any installing, except, of course, for your own benefit. Any cost of anything like that, you"ll have to stand."* Valentine: "That's right." His counsel volunteered: "The State need not pay us any interest in the meantime."

Elsewhere, in response to a question as to the property's value, Valentine said "I have a lease on the property for $275 a month and a half cent a gallon on all gallons over 40,000." No mention was made as to whether the purported lease was oral, written, month to month, for a term of years certain, or with whom, and the evidence and colloquy between court and counsel obviously negatived any notion that a ten-year written unrecorded lease would be asserted by Valentine or his associates.

The court entered an order of occupancy "subject to the right of *the defendants* (Valentines) to use the said premises * * * *until the* plaintiff *needs said premises* for construction."

It appears very clear to us that the trial court and the representatives of the state, assumed, with every reason to do so, that Valentine, the fee owner, simply want-

ed to use the premises until such time as the State needed it, and that no one had an idea of any possibility that there would be a claim of any nature asserted by anyone connected in any way with Valentine and his counsel.

If Valentine, as Vice-President of Western Refining, and his counsel, as President of Western Refining intended to assert any claim for damages for interference by the State with a ten-year lease, a full disclosure of such intention should have been made at the hearing on the motion for immediate occupancy. It is no answer, under the facts of this case, to say Western Refining was not a party to the litigation at that time. By their silence they and the company in which they were the two top officials were estopped because of non-disclosure.[1] We believe it inconceivable that the trial court at said hearing would have entered the conditional order it did, which in fact amounted to a gratuity to Western, had the court known that before him were two officials of a company that $3\frac{1}{2}$ years later would attempt to claim damages for an unexpired term of an unrecorded written "lease" that, at the time of commencement of this action, virtually was worthless.

■ At the time of hearing on motion for immediate occupancy, the instrument titled a "lease" was nothing more than an executory contract for a lease, as yet unenforceable as a lease, and hence non-compensable.[2] The "lease", dated April 10, 1952, provided that the rent was "to become due on the 10th day of August, 1952, two days before the hearing on occupancy, *or as soon thereafter as the service station is erected and accepted* as hereinafter provided." The service station at that time and on August 12, 1952, was neither "erected" nor "accepted," and but for the leniency of the trial court in permitting Valentine to continue occupation of the premises, the "lease" would have been nugatory and impossible of execution, it being quite obvious that at that point the "lessee" would have been relieved of all obligation thereunder, had the court granted occupancy unconditionally. This "lease" has never been recorded, and an examination of the records by the State could not have divulged the existence of this unusual document, which, incidentally, contained no jurat or other statement indicating authority on the part of the signatories to bind the Western Refining Company to the terms thereof. To permit Western to have damages for $6\frac{1}{2}$ years loss of business under the circumstances, after it had enjoyed a gratuitous occupancy for $3\frac{1}{2}$ years, which, according to its witnesses was highly lucrative, would be unconscionable, in our opin-

1. 19 Am.Jur. 747, Sec. 91, et seq.

2. 2 Nichols, Eminent Domain, 3rd Ed., Sec. 5.76(2), p. 115.

ion, and would do violence to well-established principles governing fair market value *assessable at the time suit was commenced.* We believe the trial court to have been in error under the particular facts of this case, in admitting evidence of the profits of a business operated on the premises for 3½ years, which operation commenced *after* the time suit was filed.

Even assuming that the "lease" had not been executory at the time of the taking, and that Western had entered into possession its value would be rather speculative in view of another provision therein to the effect that "The Lessors covenants (sic) for the lessee the quiet enjoyment of said term and that if the said service station or buildings shall be injured by fire as to render them untenable (sic), this lease shall be terminated." With such a provision, a fire destroying the station one day after the lease was in operation, would render the lease valueless and would release the lessee from all obligation thereunder. Hardly could it be said that the lessee in such event could claim damages for the remainder of the ten-year term, yet the court in this case awarded damages on the assumption that the lease would not be terminated under the provision mentioned. (Emphasis supplied.)

WADE, McDONOUGH and CALLISTER, JJ., concur.

CROCKETT, C. J., concurs in result.